**STATE of Maine**

**v.**

**Gerald LeBLANC.**

Supreme Judicial Court of Maine.

April 20, 1972.

Foahd J. Saliem, County Atty., Augusta, for plaintiff.

Alan C. Sherman, Waterville, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

WERNICK, Justice.

Defendant, LeBlanc, tried with a co-defendant on a charge of murder before a jury, was found guilty as charged [1] and on June 24, 1958 was sentenced to life imprisonment. An appeal from the judgment of conviction (which under our procedure at that time was embodied in the sentence) was timely filed but was subsequently withdrawn. It thus appeared that there had been entered against defendant a final judgment of conviction of murder.

In a subsequent post-conviction habeas corpus proceeding commenced in December of 1969, however, it was established that the defendant had been an indigent person at all times relevant in the 1958 proceedings and

"was never informed as to the rights of an indigent person to appeal nor was he consulted when the appeal was· withdrawn."

It was decided, therefore, that the judgment of conviction against defendant had not become final but remained subject to a right of appeal. Accordingly, in 1970 defendant was afforded a reinstated right to perfect his appeal from the 1958 judgment of conviction. Defendant perfected the appeal and it is now before us for decision.

I

Among the issues raised by defendant in the appeal are three questions generated by principles of constitutional law newly formulated since the judgment of conviction was entered in 1958. They are the following: (1) the improper admission into evidence, in violation of the evidence-exclusionary rule promulgated in Mapp v.

---

I. The jury also convicted the co-defendant of murder as charged.

Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed. 2d 1081 (1961), of various articles claimed to have been seized in contravention of the Fourth Amendment as incorporated in the Fourteenth Amendment of the Constitution of the United States; (2) the improper admission into evidence of identification testimony allegedly tainted by a violation of the Sixth Amendment as incorporated into the Fourteenth Amendment in that defendant was without counsel (unwaived) at a pre-trial identification confrontation held at an allegedly critical stage of the proceedings—within the doctrine of Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) [2]—and cf. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); and (3) prejudicial error in the proceedings claimed to have resulted because of a violation of the Sixth Amendment as embodied in the Fourteenth Amendment in that defendant was without counsel (unwaived) at the bindover probable cause hearing, a critical stage of the proceedings,—as held by Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970).

It is clear that had defendant's appeal come before this Court and been decided in 1958, none of the foregoing principles would have furnished a basis for decision; they were then not yet promulgated to be cognizable.

Furthermore, since each of these new constitutional principles has been held to be operative without legal effectiveness as to 1958—respectively, in Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); and Adams v. Illinois, 405 U.S. 278, 92 S.Ct. 916, 31 L.Ed.2d 202 (1972), each principle would be without benefit to defendant were he engaged in a proceeding recognizing the finality of the 1958 judgment but attacking it collaterally, in spite of its finality, to achieve post-conviction remedy. Linkletter v. Walker, supra.

Defendant, however, maintains that the present proceeding, because it is an appeal, seeks a review of the 1958 judgment of conviction by a direct attack on the judgment before it has become final.

Defendant asserts that the character of the present proceeding as a direct attack on a judgment not yet final has not been altered, or lost, because it emerged as the result of an intervening proceeding in which the judgment had been treated as ostensibly final and had been subjected to collateral attack by post-conviction habeas corpus procedures.

Defendant argues, further, that since the nature of the present proceeding is an appeal from a judgment which is not yet final and is in the process of being reviewed to ascertain whether it shall become final, the decision must be predicated upon *currently* controlling principles of constitutional law, including those newly formulated as above mentioned. Hence, defendant characterizes as irrelevant the point that these new principles have been held to be effective prospectively only from and after specific dates which are subsequent to the judgment of conviction entered in 1958.

2. In People v. Kirby, 121 Ill.App.2d 323, 257 N.E.2d 589 (1970), cert. granted 402 U.S. 995, 91 S.Ct. 2178, 29 L.Ed.2d 160 (1971), the principle of *Gilbert*, requiring counsel at a *post-indictment* but pre-trial identification confrontation, was held inapplicable to a *post-custody but pre-indictment* identification confrontation. The rationale was that the pre-indictment stage of the proceedings is, in this respect, *not* a critical stage of the proceedings.

The case was orally argued before the Supreme Court of the United States on November 11, 1971. 10 CrL 4067–4069. On January 24, 1972 the Court ordered Kirby v. Illinois restored to the calendar for reargument. 404 U.S. 1055, 92 S.Ct. 743, 30 L.Ed.2d 744 (1972). On February 28, 1972 the Court granted the motion of the Attorney General of California for leave to participate in oral argument as amicus curiae. 405 U.S. 951, 92 S.Ct. 1178, 31 L.Ed.2d 228. The case was reargued on March 20, 21, 1972. 40 L.W. 3464.

Defendant may be held correct in his position that the present proceeding, regardless that it resulted from a collateral attack upon the original judgment of conviction by post-conviction habeas corpus, is to be characterized as a direct attack upon a judgment not yet final. Defendant is in error, however, in his claim that the nature of the proceeding as a direct attack upon a judgment not yet final mandates that *current* constitutional law must be held governing and that the retrospective-prospective distinctions developed to ascertain the operative effectiveness of newly formulated constitutional principles in particular cases are immaterial to the present proceeding.

While there had been a time when it was accepted without question that the retrospectivity-prospectivity distinction was a function only of post-conviction collateral attack proceedings and that *current* constitutional law would control in a direct review of a judgment by appeal, Linkletter v. Walker, supra, this principle has now been repudiated. After various incursions made in cases such as Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed. 2d 882 (1966), Stovall v. Denno, supra, and Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969) upon the doctrine (assumed in *Linkletter*) that current law governs in every direct review of a judgment, the Supreme Court of the United States has finally laid the doctrine to rest in Williams v. United States, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971).

In Williams v. United States, the Supreme Court of the United States decided that the choice of whether current, or prior, constitutional law will govern in a particular criminal proceeding will be made independently of, and unaffected by, the stage of the proceeding if before judgment or, if after judgment, by the nature of the proceeding as a direct review of, or collateral attack upon, the judgment. Rather, the choice of prior, or current, constitutional law as controlling will depend upon a weigh-

ing of the merits and demerits in each case

"by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation" (p. 652, 91 S.Ct. p. 1152)

and described in further detail as

"(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards." (n. 5, p. 652, 91 S.Ct. p. 1152)

■ Williams v. United States, supra, thus settles—in combination with Linkletter v. Walker, supra, Stovall v. Denno, supra, and Adams v. Illinois, supra—that defendant must now fail in his reliance upon the three points of appeal as above delineated. They are predicated on principles of constitutional law newly formulated and held prospectively effective only as of 1961 and subsequently and which, therefore, are without application to the legal validity of a 1958 judgment of conviction. This remains true notwithstanding that the instant proceeding is a direct review of the judgment before it has become final.

## II

We proceed to consider the other points of appeal raised by defendant.

Independently of the right to counsel (under the Sixth Amendment as incorporated into the Fourteenth Amendment) as having constitutional bearing upon a pretrial identification confrontation conducted at a critical stage of the proceedings, defendant maintains the methods used in the confrontation here involved were so unfair as to violate the "due process" clause of the Fourteenth Amendment.

Traditionally, the due process clause of the Fourteenth Amendment has been recog-

nized to yield a direct general principle of control of State governmental action which anteceded, and is theoretically separate from, the explicit delineations of those amendments contained in the Federal Bill of Rights which, in recent years, indirectly, through incorporation into the due process clause of the Fourteenth Amendment, have become additional minimal standards by which State action is monitored.

This long standing principle of fundamental "due process of law" can affect the validity of a State prosecution if action of State law-enforcement officials, in relation to evidence used in the prosecution, is held to fail to "respect certain decencies of civilized conduct" and, therefore, to be "methods that offend 'a sense of justice.'" Rochin v. California, 342 U.S. 165, 173, 72 S.Ct. 205, 210, 96 L.Ed. 183 (1952).

In 1952, *Rochin* itself had pointed to the earlier origins of the principle when it said:

"It has long since ceased to be true that due process of law is heedless of the means by which otherwise relevant and credible evidence is obtained. This was not true even before the series of recent cases enforced the constitutional principle that the States may not base convictions upon confessions, however much verified, obtained by coercion." (pp. 172, 173, 72 S.Ct. p. 210)

In this statement Justice Frankfurter writing for the Court majority in *Rochin* surely had in mind the decision, and concepts utilized to reach the decision, in Malinski v. New York, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029 (1945), including the comprehensive analysis promulgated by him in his own concurring opinion in which he had explained:

(1) "The Due Process Clause of the Fourteenth Amendment . . . has potency different from and independ-

ent of the specific provisions contained in the Bill of Rights." (pp. 414, 415, 65 S.Ct. p. 788)

(2) "Judicial review of that guaranty of the Fourteenth Amendment [due process] inescapably imposes . . . an exercise of judgment upon the whole course of the proceedings in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses." (pp. 416, 417, 65 S.Ct. p. 789)

The same principle was plainly referred to by this Court in 1956 in relation to the evidentiary aspects of a criminal trial by the language:

"Due process of law is another name for governmental fair play." State v. Munsey, 152 Me. 198, 201, 127 A.2d 79, 81 (1956).

■ Thus, when defendant relies upon Stovall v. Denno, supra, the 1967 decision date of *Stovall* does not preclude its applicability to the 1958 judgment presently under review. The due process principle here being invoked existed, and was operative, prior to *Stovall* as well as prior to the time of the entirety of the proceedings now under review. The potential application of the principle of governmental fairness to the methods utilized by State law enforcement officials in the conduct of a pre-trial confrontation for identification purposes, and its effect upon identification testimony given at a trial in a State Court, was reasonably cognizable in 1958 as well as in prior years. Hence, the *Stovall* analysis, insofar as relates to generalized due process fairness in a pre-trial identification confrontation, and its bearing upon the admissibility of evidence adduced during trial concerning identification of the defendant, is applicable to the decision of the present appeal. An asserted limitation

to prospectivity from 1967 forward would be erroneous.[3]

The present record reveals a pre-trial identification confrontation conducted in the following manner.

Shortly after defendant had been taken into custody as a suspect of the crime of murder in relation to a homicide which had occurred during the commission of a robbery against three persons, one of whom was killed, the two survivors (eyewitnesses) were brought to the police station. The police arranged a procedure by which the eyewitnesses were enabled to look through a window so constructed that it allowed only one-directional visibility (in the direction in which the eyewitnesses were looking). Through this window the observers looked into a room in which were sitting the defendant and two other men who were detectives. The witnesses knew the two men who were sitting with the defendant. They knew also that they were detectives. After looking through the window, the two eyewitnesses identified the defendant to the police as one of two men who had perpetrated the robbery during, and because of which, the homicide had occurred.

During the trial, these two eyewitnesses gave testimony in which they described the identification made by them of the defendant at the pre-trial confrontation. In addition, they made an identification of the defendant at the trial.

In Stovall v. Denno, supra, the Supreme Court of the United States, after holding that the "fairness" mandate of the due process clause forbids methods of pre-trial identification confrontations which are

"unnecessarily suggestive and conducive to irreparable mistaken identification" (p. 302, 87 S.Ct. p. 1972);

adverted immediately to the point that

"[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." (p. 302, 87 S.Ct. p. 1972)

In addition, the Court in *Stovall* emphasized that it remained aware (by its reaffirmation in summary form of the discussions previously presented in *Wade* and *Gilbert*) of

"the dangers and unfairness inherent in confrontations for identification" (p. 298, 87 S.Ct. p. 1970)

insofar as:

"The possibility of unfairness . . . is great, both because of the manner in which confrontations are frequently conducted, and because of the likelihood that the accused will often be precluded from reconstructing what occurred and thereby from obtaining a full hearing on the identification issue at trial." (p. 298, 87 S.Ct. pp. 1970–1971)

The Court found further strong potential for unfairness in the likelihood, confirmed in experience, that identifications made at pre-trial confrontations will harden because the identifying witness becomes reluctant to retract his identification, and, therefore, as was said in United States v. Wade, supra:

" 'in practice the issue of identity may . . . for all practical purposes be determined there and then, before the trial.' " (p. 229, 87 S.Ct. p. 1933)

Against the background of this underlying discussion, the Court in *Stovall* proceeded to promulgate a "totality of circumstances" doctrine on the basis of which a judgment is to be reached whether a particular identification confrontation in "the

---

3. *Cf.* Adams v. Illinois, 405 U.S. 278, 92 S.Ct. 916, 31 L.Ed.2d 202 (1972). *Adams* distinguishes between the absence of counsel (through the Sixth and Fourteenth Amendments) as a constitutional infirmity and such separate and independent constitutional error as might inhere in a denial of due process. As to this latter, in contrast to the former, the Court clarifies that by such a claim petitioner would be entitled to "a hearing without regard to today's holding that *Coleman* [the right to counsel claim] is not to be retroactively applied." (p. ——, 92 S.Ct. p. 920)

totality of the circumstances surrounding it" (p. 302, 87 S.Ct. p. 1972) can be said to be excessively suggestive and so likely to cause a mistaken identification which is likely to remain firm that it is basically unfair and, hence, a violation of due process of law.

There is, however, one facet of the "totality of circumstances" principle promulgated in *Stovall* concerning which *Stovall* itself is unclear and which, because of the state of the evidence in the case now before us, becomes extremely important.

While the present record is clear as to the manner in which the identification confrontation was conducted, it is silent as to other facts which might well have been part of the totality of surrounding circumstances and which would bear upon an explanation of why the police resorted to the particular method of confrontation here involved. What appears is only that defendant was presented for identification purposes to witnesses in a manner which, in effect, singled him out, conspicuously, as one person suspected by the police of being a participant in the crime, and without his being aware that the identification confrontation was occurring.

The question thus arises regarding the import of *Stovall,* in connection with the allocation of burdens of ultimate proof and of going forward with evidence, when the record inadequately presents the *totality* of such circumstances as might have existed in fact.

*Stovall* is not explicit on this point. It furnishes guidance to an answer, however, in its extended discussions of the dangers of unfairness generally "inherent" in pretrial identification confrontations and its observation that the particular

"practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup," (p. 302, 87 S.Ct. p. 1972)

has been "widely condemned."

This basic approach strongly suggests that the Supreme Court of the United States would consider that a procedure of showing a person already in custody, secretly and singly, for purposes of identification, especially when this is done at the police station where the person is being held, is *prima facie* unfair and, therefore, *prima facie,* a violation of due process of law because (1) such manner of exhibition is in itself dangerously suggestive and (2) defendant's lack of awareness that a confrontation has occurred will make it difficult for him effectively to reconstruct the circumstances of the confrontation and impeach the reliability of the identification evidence presented at trial. Such *prima facie* contravention of due process would be conceived to harden into an actual constitutional violation *unless* there appears, affirmatively, a showing of additional circumstances either mitigating the suggestiveness initially indicated or providing a justification or excuse for the practice in accordance with the standard that particular compelling or exigent circumstances make the practice reasonably necessary.

In *Stovall* itself a confrontation in which the police presented a suspect in their custody, singly, to a witness confined in a hospital room was held by the Supreme Court of the United States, in spite of the highly suggestive tendency, to be justified by circumstances establishing that

"an immediate hospital confrontation was imperative." (p. 302, 87 S.Ct. p. 1972)

The Supreme Court quoted the Court of Appeals sitting en banc:

"No one knew how long . . . [the identifying witness] might live. Faced with the responsibility of identifying the attacker, with the need for immediate action and with the knowledge that . . . [the identifying witness] could not visit the jail, the police followed the only feasible procedure and took Stovall to the hospital room. Under these circumstances, the usual police station line-

up, which Stovall now argues he should have had, was out of the question." [4] (p. 302, 87 S.Ct. p. 1972)

If it be a correct interpretation of the "totality of circumstances" principle utilized in *Stovall* that the widely condemned practice of showing a suspect singly to persons for the purpose of identification, and not as part of a lineup,—especially if the confrontation occurs at a police station at which the defendant is being held and is achieved without defendant's having been aware of it,—in itself yields such suggestiveness and danger of an irreparable mistaken identification that it is *prima facie* a violation of constitutional due process and, therefore, must be affirmatively explained, justified or mitigated, we should be obliged in the present situation to decide that the identification confrontation here involved was, in the ultimo, a violation of due process. The defendant was presented for identification secretly and, in practical effect, singly and in a context marking him conspicuously as the police suspect; and there is an absence in the record of circumstances which mitigate the effects of the suggestiveness or which could justify or excuse its presence on the basis of exigency or practical necessity.

We conclude, however, that under the special circumstances of the case at bar, it becomes unnecessary that we decide whether there was such actual constitutional infirmity.

Even if we assume, arguendo, the existence of a due process violation in the conduct of the confrontation, and that it tainted the identification testimony offered at trial, on the total record the conviction must be sustained under the "harmless error beyond a reasonable doubt" doctrine of Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

■ This doctrine is applicable to a constitutional error committed by the admission into evidence of identification testimony tainted by a due process violation in the conduct of a pre-trial identification confrontation. Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969).

■ A review of the special circumstances of the present case establishes that the identification of defendant had really been eliminated as rationally open to question.

First, the defendant took the witness stand in his own behalf and admitted on the witness stand that he was one of the participants in the incident involved. He thus identified himself.

In addition, evidence concerning the identity of defendant, and entirely other than that of the eyewitnesses who identified the defendant at the trial, revealed circumstantial identification of the defendant so overwhelmingly that the identification testimony of the eyewitnesses was superfluous.

This other evidence shows that defendant was virtually caught in the act. Immediately following the robbery-homicide, the surviving victims drove to a telephone and called the State Police. During that telephone conversation they provided a description of the culprits to the police as two persons riding in a light blue late model

---

4. Cf., in this context, State v. Galloway, Me., 247 A.2d 104 (1968).

In *Galloway*, although the defendant was not exhibited singly or otherwise conspicuously, this Court nevertheless mentioned an affirmative reason for the failure to present defendant as part of a lineup.

Cf. also: Trask v. State, Me., 247 A.2d 114 (1968) in which the defendant, dressed in jail clothing, and alone, was brought to a hospital bedside by an officer from the Sheriff's department. This Court took pains to *explain away* the effect of the initial suggestiveness by emphasizing that there was evidence revealing that the witness in the hospital bed "spontaneously" identified the defendant. Further, the Court mentioned a reason which had prompted the hospital confrontation insofar as the victim was about to be taken from the hospital in Belfast to a hospital in Portland for neurological attention.

Ford. Within five minutes after receipt of the telephone call and the furnishing of the description, the State Police spotted, and commenced chasing, a light blue, late model Ford in the area in which the crime had been reported to have occurred. The police chased this Ford to the City of Augusta, where, when it confronted a road block, the Ford finally came to a stop. In the Ford were the defendant and co-defendant. Also found in the Ford were the wallet (containing an identification) of one of the eyewitnesses and a dollar bill with spots on it which chemical analysis showed to be blood. This eyewitness had testified that while he had been propping up the homicide victim, some of the victim's blood had come onto his (the eyewitness') hands and the blood remained on his hands as he had passed a dollar bill to one of the robbers who had demanded it.

In light of this evidence so cogently pinpointing the defendant as one of the participants in the robbery,—and the evidence showing, in addition, that while the robbery was in process of commission either defendant, LeBlanc, or the co-defendant on trial with him, shot and killed one of the three robbery victims, such that under the felony-murder rule the defendant was guilty of murder as a participant in the robbery regardless of whether he was identified correctly as the person who had pulled the trigger of the gun which caused the homicide,—and together with defendant's own at-trial admission of his participation, we find it incredible that a rational jury might have acquitted the defendant for *lack of identification* had the identification testimony of the eyewitnesses been excluded.

We conclude, therefore, that if there was constitutional error in the admission of this testimony, it was harmless beyond a reasonable doubt.

Another point of appeal raised by defendant concerns alleged errors in two instructions given by the presiding Justice to the jury.

Since no exceptions were taken to these instructions (in accordance with the procedure by which in 1958 claims of error in the charge of the presiding Justice were appropriately preserved for appellate scrutiny), the instructions are reviewable in this appeal only if they produced error which denied defendant a fair trial. State v. Wright, 128 Me. 404, 148 A. 141 (1929); State v. White, Me., 217 A.2d 212 (1966); Rule 52(b) M.R.Crim.P.

One of the instructions claimed improper was:

"The law says that a jury cannot believe if a jury has a reasonable doubt. I call your attention to this and I must caution you against it."

Appellant claims that by this instruction the jury was cautioned *against acquitting* should they find a reasonable doubt,—the opposite of the correct principle that they *must* acquit if they find a reasonable doubt.

We disagree with defendant's interpretation. In context, and immediately preceding the instruction at issue, the Court had clearly told the jury:

"Members of the Jury, a reasonable doubt is simply what it says, a reasonable doubt, and the burden is upon the State to prove to you the truth of its contentions beyond all reasonable doubt. That is, the complete picture must cause you to believe in the guilt of the accused, and when you believe you must have no reason to doubt it."

The charge adequately gave the jury the correct law. Even had proper exception been taken to raise the issue on appeal, the charge would be found without error. A fortiori, a claim of manifest error causing injustice is patently without merit.

The second instruction alleged to be manifestly erroneous was:

"Mr. Foreman and members of the Jury: life is an abstract proposition, it is rather cheap and common. There is so much

of it. Concretely and for the individual, it is priceless, it is rare. The law says that each and all of us are entitled to live our full and complete lives, and to each and all of us it says, 'Thou shalt not kill.'

"I might call your attention to the fact that the State of Maine follows this law, and, for fear that a mistake sometime might be made and the Governor and Council have no opportunity to rectify it, the State never exacts the extreme penalty, whatever the individual may be guilty of."

Appellant argues that this instruction could have misled the jury into believing that they need not be too seriously concerned about convicting the defendant on evidence falling below the standard of "proof beyond a reasonable doubt" since executive clemency is available, in any event, to protect the defendant.

In our view, the instruction is not reasonably susceptible of the interpretation defendant would give it. The presiding Justice was directing the attention of the jury to the high value placed by the law upon human life. He chose to offer a concrete illustration to show the jury that life is held too precious to be subjected to the possibility of error and, for this reason, the State of Maine declines to impose capital punishment which involves the possibility of an irreparable mistake. Especially in view of the long and detailed instructions emphasizing that a conviction could be properly returned by the jury only if the evidence satisfied the jury of guilt beyond a reasonable doubt, and which the presiding Justice had offered both before and after the comment in question, we find no basis for a conclusion that the comment was likely to have induced the jury erroneously to convict, in the face of a reasonable doubt, on the assumption that executive clemency could correct the jury's error. Plainly, the remark of the presiding Justice was not likely to, nor did it, produce injustice in the form of an unfair trial of the defendant.

 Finally, defendant urges that his representation by court-appointed counsel at trial was inadequate. This issue may not be raised on appeal, State v. Pullen, Me., 266 A.2d 222 (1970); State v. Lund, Me., 266 A.2d 869 (1970) unless the appeal record, within its own confines, establishes beyond possibility of rational disagreement the existence of representational deficiencies by counsel which are plainly beyond rational explanation or justification and are of sufficient magnitude to have made the trial, in effect, a sham.

No such, if any, infirmities or representation by counsel appear in this record. The issue of counsel inadequacy, as here asserted, is thus not open in this appeal. The remedy is by post-conviction proceedings, *Pullen* supra, and *Lund,* supra.

The entry must be:

Appeal denied.

All Justices concurring.

WEBBER, J., did not sit.